**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| LHOEDIA S. MACK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 12-cv-74-CVE-TLW |
| ) | |
| CAROLYN W. COLVIN[1], ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Plaintiff Lhoedia S. Mack[2] seeks judicial review of the Commissioner of the Social Security Administration's decision finding that she is not disabled. As set forth below, the undersigned recommends that the Commissioner's decision denying benefits be **AFFIRMED**.

## INTRODUCTION

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423 (d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment

---

[1] **Error! Main Document Only.**Effective February 14, 2013, pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, Acting Commissioner of Social Security, is substituted as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Plaintiff was a minor when her grandmother filed the application for benefits on plaintiff's behalf. Plaintiff was substituted as the party in interest when she turned eighteen.

and the severity of that impairment during the time of his alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

**<u>Sequential Evaluation for Child's Disability Benefits</u>**

The procedures for evaluating disability for children are set out at 20 C.F.R. § 416.924(a). The first step is to determine whether the child is performing substantial gainful activity. If not, the next consideration is whether the child has a "severe" mental or physical impairment. A "severe" impairment is one that causes more than minimal functional limitations. If a "severe" impairment is identified, the claim is reviewed to determine whether the child has an impairment that: (1) meets, medically equals, or functionally equals the listings of impairments for children;[3] and (2) meets the duration requirement.

---

[3] The listings describe, for each of the major body systems, medical findings which are considered severe enough that they represent impairments which presumptively demonstrate disability. 20 C.F.R. Pt. 404, Subpt. P, App.1.

If the child does not have impairments of a severity to meet a listing, the severity of the limitations imposed by impairments are analyzed to determine whether they functionally equal a listing. Six broad areas of functioning, called domains, are considered to assess what a child can and cannot do. Impairments functionally equal a listing when the impairments result in "marked" limitations in two domains or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a. The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). A limitation is "marked" when it interferes seriously with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation interferes very seriously with the ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i).

## BACKGROUND

Plaintiff's grandmother applied for Title XVI benefits on behalf of plaintiff, then a fifteen-year old female, on September 30, 2008, alleging a disability onset date of September 18, 2008. (R. 130-36). The application stated that plaintiff was disabled due to ADHD, asthma, learning disabilities, back problems, and nose bleeds. (R. 151-57). Plaintiff's claim for benefits was denied initially on February 6, 2009, and on reconsideration on May 29, 2009. (R. 67-70, 72, 73, 74-77). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (R. 80). The ALJ postponed the first scheduled hearing on March 9, 2010, because plaintiff was ill and unable to attend. (R. 55-59). The ALJ held the rescheduled hearing on June 8, 2010. (R. 35-54). The ALJ issued a decision on October 29, 2010, denying benefits and finding plaintiff not

disabled. (R. 17-34). The Appeals Council declined plaintiff's request to review the case; therefore, the ALJ's decision serves as the final decision of the Commissioner. (R. 1-14).

Plaintiff timely appealed the Commissioner's decision. (Dkt. # 2). On appeal, plaintiff alleges three points of legal error: (1) that the ALJ failed to consider a medical opinion that plaintiff meets or medically equals two listings; (2) that the ALJ failed to properly consider the medical source evidence; and (3) that the ALJ failed to conduct a proper credibility analysis. (Dkt. # 17). The Commissioner argues that the ALJ properly considered the evidence and gave specific reasons for finding plaintiff not credible.

**The ALJ's Decision**

The ALJ found that plaintiff had severe impairments of borderline intellectual functioning, oppositional defiance disorder, and generalized anxiety disorder. (R. 23). The ALJ relied on plaintiff's 2000 IQ test results and a consultative psychological examination conducted on January 22, 2009, in making those findings. Id. The ALJ rejected the grandmother's claims that plaintiff suffered from rheumatoid arthritis and that they "practically live in the hospital" due to plaintiff's asthma. Id. The ALJ found no evidence that plaintiff had ever sought emergency treatment or been hospitalized for asthma. Id. The medical records indicated only that plaintiff had seasonal allergies. Id. Additionally, a consultative physical examination in December 2008 indicated that plaintiff had clear lungs and was not taking any medication. Id.

After considering plaintiff's severe impairments, the ALJ reviewed the evidence, including testimony from the hearing. Plaintiff testified that she attended high school and participated in Army ROTC. (R. 25). She liked ROTC because it taught her discipline and motivation to do something with her life. Id. Although plaintiff's IQ testing in 2000 showed that plaintiff was "functioning in the borderline range of intellectual functioning," she was not

4

attending special education classes and had not attended special education classes since 2003. (R. 25). The ALJ noted that a second IQ test from 2008 resulted in a score of 55, but the ALJ dismissed that score because the psychologist who administered it found that plaintiff "had careless responding during portions of the testing and had a tendency to give up prematurely on some tasks" and concluded that plaintiff "had more potential ability than her scores suggested." Id.

Plaintiff also testified that she did not always get along with her grandmother, and the grandmother confirmed that plaintiff "lashes out at her." Id. She admitted that she "gets really angry and yells" and that she did not like being told to do things. Id. Plaintiff stated that she gets along well with everyone except her brother. Id.

The ALJ also considered a recent consultative psychological examination conducted by Dr. John W. Hickman. Id. Following the ALJ hearing, the ALJ sent plaintiff to Dr. Hickman for an evaluation. At that evaluation, plaintiff stated that she began hearing voices at age fourteen or fifteen. Id. Dr. Hickman reported that plaintiff gave "strange and unusual answers" that could be construed as attempts to "magnify" her mental health issues. Id. Despite the irregularities, Dr. Hickman found plaintiff's test results to be valid and diagnosed her with schizoaffective disorder, bipolar type. Id. Dr. Hickman opined that plaintiff's diagnosis was severe enough to meet Listing 112.03 (schizoaffective and related disorders). Id.

The ALJ declined to give Dr. Hickman's opinion controlling weight. (R.26). Although the ALJ noted that Dr. Hickman only saw plaintiff once to perform the evaluation, the ALJ analyzed Dr. Hickman's opinion using the treating physician's analysis. (R. 25-26). In rejecting Dr. Hickman's opinion, the ALJ found that the report was internally inconsistent and inconsistent with the other evidence in the record. Id. Although plaintiff told Dr. Hickman that

she heard voices, the record contained no evidence to support that claim, and neither plaintiff nor

her grandmother raised the issue at the hearing. (R. 25). Additionally, plaintiff had never

received mental health treatment. Id. Finally, the ALJ cited to plaintiff's active participation in

ROTC and the fact that plaintiff was not enrolled in special education classes. Id. The ALJ also

specifically rejected Dr. Hickman's opinion that plaintiff met Listing 112.03. Id. The ALJ held

that whether plaintiff met a listing was an issue reserved to the Commissioner and noted that

even a treating physician's opinion on an issue reserved to the Commissioner could never be

given controlling weight or special significance. (R. 25-26).

Based on his review of the record, the ALJ concluded that plaintiff did not meet or

medically equal a listed impairment. (R. 23). The ALJ gave special consideration to Listing

112.05 (mental retardation in children) and Listing 112.06 (anxiety disorders in children). (R.

24). With respect to plaintiff's generalized anxiety disorder, the ALJ found no evidence of

symptoms that would qualify plaintiff for disability due to anxiety, such as panic attacks and

recurrent obsessions or compulsions. Id.

The ALJ then assessed plaintiff's limitations across the six areas of functioning used to

assess whether a child has the functional equivalence of a listing impairment, as set forth in 20

C.F.R. § 416.924(a). (R. 24-31). In the first area, acquiring and using information, the ALJ found

that plaintiff had a less than marked limitation. (R. 26-27). The ALJ found that although plaintiff

had a borderline IQ score, she had not been in special education classes since 2003. (R. 27). In

the second area of functioning, attending and completing tasks, the ALJ found that plaintiff had a

less than marked limitation. Id. Plaintiff's signs of inattention and lack of focus were attributed

to "a tendency to respond carelessly and give up prematurely," based on her behavior during

testing. Id. Plaintiff also had a less than marked limitation in the area of interacting and relating

to others. (R. 28). The ALJ found that plaintiff's Oppositional Defiance Disorder was largely directed at her grandmother, noting that plaintiff had no behavioral issues at school. Id. Plaintiff did not allege any limitations in the area of moving about and manipulating objects, and the ALJ found that plaintiff had no limitations. (R. 29). In the fifth area of functioning, caring for herself, plaintiff had a less than marked limitation. (R. 29-30). Although plaintiff had some issues with personal hygiene, she could take care of her personal needs. (R. 30). Finally, the ALJ found that plaintiff had no limitations in the area of health and physical well-being because plaintiff took no medications. (R. 30-31). In all six areas of functioning, the ALJ relied on the two agency experts who had reviewed plaintiff's case. (R. 26-31).

Because plaintiff did not meet a listing and because she did "not have an impairment or combination of impairments that result in either 'marked' limitations in two domains of functioning or 'extreme' limitation in one domain of functioning," the ALJ concluded that plaintiff was not disabled and denied her application for benefits. (R. 23, 31).

**Plaintiff's Medical Records**

Plaintiff submitted very few medical records for review. Her records indicate that she received a "well child check" at age thirteen. (R. 233-38). Plaintiff also received a tetanus shot and was diagnosed with seasonal allergies. Id. In January 2010, plaintiff complained of back pain that increased during menstruation. (R. 265-77). Plaintiff's lumbar spine was tender to palpitation at the examination. Id. Because plaintiff reported being sexually active, her doctor scheduled her for a "well woman check." Id. At that examination, plaintiff was diagnosed with "dysmenorrhea" and "bacterial vaginosis." (R. 273). She received a prescription for birth control and an antibiotic. Id.

Plaintiff also submitted school records from 2000 and 2003. The 2000 records show that plaintiff was referred for IQ testing due to issues with her reading and math skills and her short attention span. (R. 217-25). Plaintiff's testing revealed a full-scale IQ of 76, which indicated plaintiff had borderline intellectual functioning. (R. 222). The testing also listed plaintiff's relative strengths – "Abstract reasoning, Verbal reasoning, General word knowledge" – and her relative weaknesses, which included poor concentration and attention span, short-term auditory memory, and social awareness. (R. 223). Her 2003 records showed that plaintiff had no trouble working in a timely manner, no learning disabilities, and no disciplinary issues. (R. 217). Plaintiff was working below grade level for her age, however, so she participated in an IEP (special education service) that provided her with weekly small group peer tutoring. (R. 217, 220).

Plaintiff also underwent a number of consultative examinations following her application for benefits. In December 2008, plaintiff participated in a physical consultative examination with Dr. Joel Hopper. (R. 240-45). Plaintiff complained of ADD symptoms, but she had no physical issues. Id. Dr. Hopper assessed plaintiff with ADD and a history of asthma. Id. Also in December 2008, plaintiff received a consultative psychological evaluation from Dr. William Cooper. (R. 246-47). Dr. Cooper found that plaintiff spoke little during the examination but was able to adequately express her thoughts. Id. Dr. Cooper administered an IQ test that revealed a full-scale IQ score of 55, but Dr. Cooper dismissed those results. Id. He found that plaintiff gave up easily on tasks without applying much effort and gave "careless" responses. Id. As a result of plaintiff's behavior during the testing, Dr. Cooper opined that plaintiff had a higher ability than her score suggested and that depression or some other underlying emotional issue was impacting plaintiff's ability to perform the testing to the best of her ability. Id.

8

After receiving Dr. Cooper's report, the Commissioner sent plaintiff for a mental status examination in January 2009. (R. 249-51). Dr. Stephanie Crall performed the examination. (R. 249). She found that plaintiff had no speech or motor issues and that plaintiff was pleasant and cooperative throughout the interview. Id. Much of Dr. Crall's opinion was based on the history given by plaintiff and her grandmother, which Dr. Crall found to be reliable. Id. Although she performed no independent testing, Dr. Crall assessed plaintiff with oppositional defiance disorder, generalized anxiety disorder, and ADD. Id.

Finally, plaintiff underwent a second consultative psychological examination in September 2010, following the ALJ hearing. Dr. John Hickman evaluated plaintiff using the MMPI-2 and performed an IQ test, which yielded a score of 71. (R. 278-84). Dr. Hickman noted that plaintiff was tired from being up all night and that he frequently had to encourage plaintiff to give more effort to the testing. Id. He also noted that plaintiff "endorsed a severe number of strange and unusual questions which can be interpreted as reflective of a high degree of stress and/or psychopathology or as a magnification of her difficulties." (R. 280). Although he thought her test scores should be "interpreted with caution," he nonetheless found them valid. Id. Dr. Hickman assessed plaintiff with schizoaffective disorder, bipolar type, as well as a history of ADHD, ODD, and anxiety disorder based on plaintiff's self-reporting. (R. 281). Dr. Hickman also opined that plaintiff met the listings for schizoaffective disorders (Listing 112.03) and attention deficit hyperactivity disorder (Listing 112.11). (R. 281, 283).

**The ALJ Hearing**

The ALJ postponed the hearing, originally scheduled for March 9, 2010, after plaintiff did not appear due to illness. (R. 55-59). The rescheduled hearing took place on June 8, 2010. (R. 35-54). Plaintiff's grandmother testified that she filed the application on plaintiff's behalf

because plaintiff "lashes out" at her when the grandmother asks her to do something. (R. 41). Plaintiff's grandmother stated that because she had raised plaintiff, she "can see what nobody else can see" and knows that something is wrong with plaintiff. Id.

Plaintiff testified that she was in the eleventh grade, made good grades, and participated in ROTC. (R. 42). Plaintiff likes being in ROTC because it teaches her discipline, leadership, and motivation. (R. 42-43). Plaintiff stated that she had been in special education classes in elementary and middle school. (R. 44). Plaintiff also stated that the school had considered putting her in special education classes when she started high school, but the school opted to put her in regular classes. Id.

Plaintiff testified that she had emotional issues. (R. 45). She described getting angry when her grandmother asked her to do something, particularly if she was reading or doing homework. (R. 45-46). Plaintiff mentioned several times that she read books frequently and that she would become upset when someone disturbed her reading. (R. 46). Plaintiff stated that she would get angry with teachers or students who interrupted her reading, but she held her temper at school because she did not want to "get written up for it." (R. 46-48). Plaintiff explained that she had trouble with concentrating and staying focused, so she did not like to be disturbed. (R. 47). Other than arguments with her brother, which she said sometimes involved the police or "weapons," plaintiff testified that she got along well with others. (R. 46-49). She would talk to other students at school, but she did not like to be around other students when they were loud because loud noises made her nervous. (R. 46).

Physically, plaintiff testified that her menstrual cycle causes cramps that make her angry and interfere with her class attendance at school. (R. 51). Plaintiff's grandmother did not have any additional information on that issue, but she did state that she "practically live[d] at the

hospital" with plaintiff when her asthma flares. (R. 52). Plaintiff's grandmother also testified that she took plaintiff to the doctor "quite often," which she defined as "two weeks at a time." Id.

## ANALYSIS

Plaintiff raises three points of error. First, plaintiff argues that the ALJ failed to consider whether plaintiff meets the listings for schizoaffective disorder and attention deficit hyperactivity disorder, based on Dr. Hickman's report. (Dkt. # 17). Second, plaintiff argues that the ALJ failed to properly conduct the treating physician analysis with respect to Dr. Hickman's report and to specifically state what weight he gave to Dr. Hickman's opinion. Id. Finally, plaintiff argues that the ALJ failed to conduct a proper credibility analysis. Id.

The Commissioner argues that Dr. Hickman was not a treating physician, that the ALJ did not analyze his report as a treating physician's opinion, and that the ALJ did properly analyze Dr. Hickman's report. (Dkt. #18). The Commissioner also contends that the ALJ's credibility analysis is supported by specific findings. Id.

Because plaintiff's first two points of error are related to the ALJ's analysis of Dr. Hickman's opinion, the undersigned considers the two arguments together.

## Dr. Hickman's Opinion

### Treating physician vs. consultative examining physician

Plaintiff improperly characterizes the ALJ's treatment of Dr. Hickman's opinion as a treating physician's opinion. (Dkt. # 17). Although the ALJ's recitation of the legal standards for consideration of medical source opinions uses language that addresses a treating physician's opinion, neither the ALJ nor the parties considered Dr. Hickman to be a treating physician. (R. 25-26). First, Dr. Hickman was a one-time consultative examiner, something the ALJ noted when he specifically held that Dr. Hickman's report was written based on a "one-time

evaluation." (R. 25). Second, when the ALJ proposed to add Dr. Hickman's report to the record, plaintiff's attorney agreed and called it an "evaluation." (R. 232). Third, when Dr. Hickman sought payment from the SSA for his services, he indicated that the appointment with plaintiff was made as part of her application for benefits, and he labeled the report a "Disability Evaluation Report." (R. 276-77). Thus, while the ALJ's statements regarding the law are inartfully drafted, the ALJ correctly categorized Dr. Hickman as an examining physician, not as a treating physician. Therefore, plaintiff's argument that the ALJ did not properly apply the treating physician's analysis is without merit.

<u>Consideration of Dr. Hickman's Opinion</u>

Plaintiff argued that the ALJ erred in failing to consider whether plaintiff met the listings identified in Dr. Hickman's report. (Dkt. # 17). In his report, Dr. Hickman opined that plaintiff suffered from schizoaffective disorder, bipolar type. (R. 281). Based on plaintiff's self-reporting, Dr. Hickman also opined that plaintiff had ADHD, oppositional defiance disorder, and anxiety disorder. <u>Id.</u> Dr. Hickman stated that plaintiff met the listings for schizoaffective disorders (Listing 112.03) and attention deficit hyperactivity disorder (Listing 112.11). (R. 281, 283).

The ALJ noted that Dr. Hickman "felt the claimant had a schizoaffective disorder, bipolar type" and "stated that the severity of the claimant's impairments met the requirements of Listing 112.03 . . . ." (R. 25). Citing the applicable administrative regulations and rulings, the ALJ found that some of Dr. Hickman's opinions were "not medical issues, but are administrative findings" reserved to the Commissioner. <u>Id.</u> (citing SSR 96-5p and 20 C.F.R. § 404.1527(e)).The ALJ further held that "[t]reating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance." (R. 25-26).

In analyzing physician's opinions, "the opinions of physicians who have seen a claimant over a period of time for purposes of treatment are given more weight over the views of consulting physicians or those who only review the medical records and never examine the claimant." Williams v. Bowen, 844 F.2d 748, 757 (10th Cir. 1988). See also 20 C.F.R. § 416.927(c)(1)-(2); SSR. 96-6p. "The treating physician's opinion is given particular weight because of his 'unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.'" Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003) (quoting 20 C.F.R. § 416.927(c)(2)). Therefore, the opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all. See 20 C.F.R. § 416.927(1)-(2).

A physician's opinion, however, may not necessarily qualify as a medical opinion. "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2). When a physician opines on a matter reserved to the Commissioner, that opinion is not considered a medical opinion. See 20 C.F.R. § 416.927(d).

SSR 96-5p interprets 20 C.F.R. § 416.927(d) and addresses medical opinions on issues reserved to the Commissioner. Both the regulations and the ruling identify a number of issues "that are dispositive of a case" and are, therefore, issues that may only be determined by the Commissioner. 20 C.F.R. § 416.927(d); see also SSR 96-5p. "Whether an individual's

13

impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings" is one of those issues reserved to the Commissioner. SSR 96-5p. "Adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner." SSR 96-5p. However, the ALJ cannot "give any special significance to the source of an opinion on issues reserved to the Commissioner." 20 C.F.R. § 416.927(d)(3).

Even though the ALJ cannot give special significance to a physician's opinion on issues reserved to the Commissioner, such opinions "must never be ignored." SSR 96-5p. The ALJ should still analyze the medical source opinion using the following factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

Goatcher v. United States Dept. of Health & Human Svcs., 52 F.3d 288, 290 (10th Cir. 1995) (citation omitted). See also 20 C.F.R. § 416.927(c)(2)-(6). Use of these factors applies to non-treating physician's opinions as well. See Doyal v. Barnhart, 331 F.3d 758, 764 (10th Cir. 2003). The ALJ need only show that he considered the factors and explained those factors that are relevant to the case because not every factor is applicable to a particular case. See Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007).

Here, the ALJ followed the appropriate standards for reviewing Dr. Hickman's opinion. The ALJ noted that Dr. Hickman opined on issues reserved to the Commissioner, namely his

opinion that plaintiff met two listings.[4] (R. 25-26). He discounted those opinions in a manner consistent with the case law and then considered the relative merits of Dr. Hickman's report. The ALJ concluded that Dr. Hickman's report was both internally inconsistent and unsupported by the record evidence. Although plaintiff told Dr. Hickman that she started hearing voices when she was fourteen or fifteen, plaintiff had "never sought or received treatment from a mental health professional." (R. 25). Additionally, the ALJ noted that neither plaintiff nor her grandmother raised the issue during the ALJ hearing.[5] Id. These facts in the record weighed against Dr. Hickman's opinion.

Dr. Hickman's report also states that plaintiff was tired from being up all night and had "endorsed a severe number of strange and unusual questions," which could be interpreted as consistent with a diagnosis of schizoaffective disorder or as plaintiff's attempts to magnify her symptoms. (R. 25, 278-84). The ALJ interpreted these statements as conflicting. (R. 25-26). Dr. Hickman ultimately concluded that the test results were valid, but the ALJ, relying on the evidence in the record that was unavailable to Dr. Hickman, interpreted plaintiff's test results as invalid. Id. The ALJ's conclusions are supported by the record evidence cited in his opinion; therefore, the undersigned recommends a finding of no error on this issue.

―――――――――――――――――

[4] The ALJ does not specifically rebut Dr. Hickman's opinion that plaintiff met the listing for attention deficit hyperactivity disorder with the same detail as his analysis of the listing for schizoaffective disorder. However, the ALJ does address plaintiff's concentration issues at step two and in the evaluation of her functional capacities. (R. 23, 25, 27).

[5] Plaintiff argues in her brief that plaintiff's grandmother stated that plaintiff talks to herself at night and suggests that the ALJ should have questioned the grandmother about the issue. (Dkt. # 17). Plaintiff had both a consultative psychological examination and a mental status examination prior to the ALJ hearing. (R. 246-47, 249-51). Additionally, plaintiff was represented by counsel, who had the opportunity to question both plaintiff and the grandmother about plaintiff's symptoms and impairments. Under these circumstances, the ALJ was "entitled to rely on [plaintiff's] counsel to structure and present [plaintiff's] case . . . ." Hawkins v. Chater, 113 F.3d 1162, 1167-68 (10th Cir. 1997).

**Credibility**

Plaintiff argues that the ALJ failed to make proper credibility findings because he failed to state which evidence he accepted as true. (Dkt. # 17). Plaintiff also complains that the ALJ miscasts the evidence and incorrectly states many facts that would support a finding of credibility. Id. Among the facts that plaintiff cites are in-home counseling from Family & Children's Services, prescriptions for Prozac and Resperdal cited in Dr. Hickman's report, and the grandmother's statements about plaintiff's history of hospital stays due to asthma, which plaintiff claims were clearly cited as past events and not, as the ALJ found, claims to support the application for disability. Id.

This Court will not disturb an ALJ's credibility findings if they are supported by substantial evidence because "[c]redibility determinations are peculiarly the province of the finder of fact." Cowan v. Astrue, 552 F.3d 1182, 1190 (10th Cir. 2008) (citing Diaz v. Secretary of Health & Human Svcs., 898 F.2d 774, 777 (10th Cir. 1990)). Credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (citing Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)). The ALJ may consider a number of factors in assessing a claimant's credibility, including "the levels of medication and their effectiveness, the extensiveness of the attempts . . . to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).

The ALJ found both plaintiff and her grandmother not credible.[6] Plaintiff claimed in a function report to be disabled due to "ADHD, asthma, learning disabilities, back problems, and nose bleeds." (R. 151-57). With respect to plaintiff's asthma, the grandmother testified at the hearing that she "practically live[d] at the hospital with plaintiff" and that plaintiff went to the doctor "quite often" and "two weeks at a time." (R. 52). It is not clear from the record that the grandmother intended for her statements to be construed as past events not applicable to the determination. Rather, it appears that the grandmother raised these issues as support for the disability application. The ALJ cited the lack of medical evidence to support these claims, noting that plaintiff had presented no medical records diagnosing her with asthma or admitting her to the emergency room or hospital with asthma attacks. (R. 23). In fact, the medical records show only that plaintiff suffered "seasonal allergies" in 2005. Id. The ALJ also found that plaintiff took no prescription medication at all and that the consultative physical exam showed clear lungs. Id. The ALJ also relied on plaintiff's participation in ROTC, which required plaintiff to perform physical activity. (R. 25).

The record also clearly reflects that plaintiff received no mental health treatment, supporting the ALJ's determination that plaintiff's mental impairments were not disabling. Plaintiff submitted no medical records showing that she was receiving counseling, therapy, or medication management. The record does not support plaintiff's claims that she received counseling of any kind from Family & Children's Services. Although the grandmother stated in a function report that plaintiff began receiving counseling in October 2008, the only record

---

[6] Admittedly, the ALJ's credibility analysis is not as clearly stated in the opinion as it could be. A review of the ALJ's decision, however, clearly articulates the ALJ's findings and those allegations and claims that he rejected. The undersigned finds that the ALJ's credibility determinations are sufficiently specific to permit meaningful review. See Luna v. Bowen, 834 F.2d 161, 163 (10th Cir. 1987).

evidence from Family & Children's Services is the grandmother's application for assistance with developmental disabilities. (R. 185-90, 209-16). Likewise, the only evidence that plaintiff was prescribed Prozac and Resperdal is the grandmother's statement to Dr. Hickman. (R. 278). Because the ALJ cited specific, and substantial, evidence in support of his credibility determination and because the evidence does not support plaintiff's claims that the ALJ erred in making his findings, the undersigned recommends a finding of no error on this issue.

## RECOMMENDATION

For the reasons set forth above, the undersigned RECOMMENDS that the Commissioner's decision in this case be **AFFIRMED**.

## OBJECTION

In accordance with 28 U.S.C. §636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by March 22, 2013.

If specific written objections are timely filed, Fed. R. Civ. P. 72(b)(3) directs the district judge to determine *de novo* any part of the magistrate judge's disposition to which a party has properly objected. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. See also 28 U.S.C. § 636(b)(1). The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." United States v. One Parcel of Real Property, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir.

1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

SUBMITTED this 8th day of March, 2013.

T. Lane Wilson
United States Magistrate Judge